No. 48,271

STATE OF KANSAS, *Appellee*, v. EMMANUEL LEE, *Appellant*.

(558 P. 2d 1096)

Opinion filed December 11, 1976.

*Steven Hornbaker,* of Harper, Hornbaker, Abbott and Hornbaker, of Junction City, argued the cause, and *Donald J. Willy,* of the same firm, was with him on the brief for the appellant.

*John H. Taylor,* special prosecutor, argued the cause, and *Curt T. Schneider,* attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered by

MILLER, J.: Emmanuel Lee brings this direct appeal from the District Court of Morris County where he was convicted by a jury of twenty-one felony counts, one of aggravated kidnapping, eight of aggravated burglary, one of aggravated sodomy, two of

aggravated battery, seven of rape, one of attempted rape, and one of felony theft. He was sentenced to imprisonment for life on the aggravated kidnapping conviction, to consecutive terms of not less than one nor more than twenty years on each of six aggravated burglary convictions, and to various concurrent terms for the other fourteen offenses. The crimes all took place in Geary County but on defendant's motion for change of venue the case was transferred to Morris County for trial.

Defendant raises three points on appeal, contending that the trial court erred in refusing to give a requested instruction that consent is a complete defense to the charge of rape; in overruling his motion to dismiss, made on the grounds that he was denied equal protection under the law because he was not afforded funds with which to hire his own handwriting expert; and in refusing him an "independent" mental examination to determine his competency to stand trial and his sanity at the time of the commission of the offenses.

The crimes all occurred between March 28 and August 13, 1974, in Junction City. The defendant broke into the homes of eight army wives early in the morning, when the husbands were gone and the wives were still sleeping. Entry was gained by stealth. The victim usually first became aware of Lee's presence in the home when he put a pillow or pillow case over her head and held a knife at her throat. He threatened each victim that he was going to kill her or her child. All of the women were sexually molested. Several victims sustained knife wounds requiring substantial medical attention. One victim was forced from her home into an automobile and taken to two separate locations where she was repeatedly threatened and raped. In addition, the defendant took money and valuable articles from several of the homes. Some victims saw the defendant during the perpetration of the offenses, and identified him. Affidavits in the record state that defendant's fingerprints and palm prints were found in some of the homes; that some of the stolen articles were recovered from his residence and some from a friend with whom he had placed them; that index cards, bearing diagrams of the location of the residences of seven of the victims, were found in defendant's car; and that the husband of one victim found a letter (written in handwriting similar to that of the defendant) on the windshield of his truck, which letter purported to be written by the person who had

assaulted his wife. The defendant does not challenge the sufficiency of the evidence to support the convictions.

Each of the victims testified. None knew the defendant prior to the commission of the offense. The defendant entered each house surreptitiously and without consent, used a dangerous weapon and physical force, made threats as described above, and had sexual intercourse one or more times with seven of the women. The defendant did not testify and there was no direct evidence of consent. The only evidence in the record upon which he seizes to suggest consent is the testimony of one victim that she lay in bed while the defendant stood and talked with her between attacks, and the failure of some of the victims to raise an immediate outcry, offer substantial physical resistance, or make an immediate report to the authorities. Such matters may be appropriate subjects for oral argument but they need not and ordinarily should not be singled out and specifically mentioned in the court's instructions to the jury.

The requested instruction reads as follows:

"You are instructed that consent is a complete defense to the charge of rape. If you find that any of the alleged victims consented to the acts of intercourse or sodomy with the defendant, then you must return a verdict of not guilty. Among the factors you may consider in determining whether or not consent was given is evidence of the amount of physical resistance by the alleged victim, markes [sic] and bruises on her body, if there by [sic] any, the length of time it took any of the victims to lodge a complaint with the police, the doctor's testimony if any there be, and any other factors you deem to be relevant, to the issue of consent."

The trial court gave a standard instruction on the elements of rape, patterned after PIK Criminal 57.01, as to each separate rape charged. That instruction required the jury to find that the act of sexual intercourse was committed *without the consent of the victim.* The jury was also instructed to determine the weight and credit to be accorded the testimony of each witness, to use common knowledge and experience in weighing the testimony, and to decide each charge separately on the evidence.

The elements of the offense were submitted to the jury in clear and understandable language. "Consent" is a common word in everyday use, employed in the instructions in accordance with its customary and usual meaning: voluntary agreement, acceptance, approval, or acquiescence in what is proposed or has been done by another.

Justice Kaul, speaking for the court in *State v. Sparks*, 217 Kan. 204, 535 P. 2d 901, said:

". . . The court is not required to define every word or phrase in an instruction unless from a fair reading of the instructions as a whole there is likelihood the jury will be misled or left to speculate without further explanation. . . ." (p. 210.)

Here the jury was told that if it found that the act was committed *without consent* it could convict; otherwise, it could not. This was a clear statement and in no way misleading.

The requested instruction mentioned matters not in evidence, was argumentative, and in our opinion, tended to unduly emphasize portions of the evidence. The rule against argumentative instructions is aptly and concisely stated by Justice Prager in *Bechard v. Concrete Mix & Construction Inc.*, 218 Kan. 597, 545 P. 2d 334:

". . . Instructions should be general in nature insofar as possible, and should not be argumentative or unduly emphasize one particular phase of the case. Stated in another way, jury arguments should be left to the summations of counsel. . . .

". . . A court should not single out a particular theory or circumstance and give it undue emphasis although the requested instruction correctly states the law. . . ." (p. 601.)

The rule is also stated in 75 Am. Jur. 2d, Trials, § 621:

"Argument, which lies properly within the domain of counsel in the case, finds no place in instructions of the court. A court should not give, and may properly refuse, argumentative instructions. . . .

"A charge is objectionable as being argumentative when it directs the jury to look to or consider certain facts as tending toward certain conclusions, or when it suggests to the jury the probable or possible effect of the conduct of one person toward another."

The requested instruction was properly refused. The instructions given clearly stated the law and submitted the issues to the jury. Argument was left where it belongs, to trial counsel; the jury was left to weigh the evidence before it and to decide the issues. The record before us contains only eleven instructions, primarily those concerned with the charges of rape, attempted rape, and aggravated sodomy. It has long been a rule of this court that where instructional error is claimed, all of the instructions should be included in the record on appeal. *State v. Ellis*, 192 Kan. 315, 387 P. 2d 198. We have, however, concluded from the record before us that the court did not err in refusing the proposed instruction.

The defendant applied to the trial court for leave to employ a handwriting expert. The court granted his motion and authorized the expenditure of up to $300 of public funds for such service.

Apparently both the trial judge and counsel were under the impression that K. S. A. 22-4508 and the regulations thereunder limit the amount of money which a trial judge may authorize to be spent for expert or investigative services for an indigent, and that authorization for any additional funds must be secured in advance from the Judicial Administrator or the State Board of Supervisors of Panels to Aid Indigent Defendants. This is not correct.

Our statute, K. S. A. 22-4508, and the regulations thereunder, are quite comparable to the federal provisions contained in 18 U. S. C. A. 3006A (e). Our statute provides in substance that an indigent defendant may make an *ex parte* application to the court in which the action is pending for needed expert services. The court then holds an *ex parte* hearing, and if it finds that the services are necessary it shall authorize counsel to obtain them. The court is authorized to determine the reasonable compensation and approve payment. The rules of the state board require the judge to fix a tentative limitation as to the amount of money to be spent for such services. If the amount is in excess of $300, then when claim for payment is submitted the claim is subject to further review and approval by the board of supervisors as to its reasonableness and as to budget limitations. Under these provisions the services of experts and investigators have been repeatedly furnished to indigent defendants, when the trial courts have found such services necessary.

Defendant next filed a motion to dismiss, contending that he had been denied the equal protection of the law for the reason that he had been unable to employ a handwriting expert for the $300 allowed. Upon oral argument, counsel stated that he had checked with handwriting experts and "they won't even look at a piece of handwriting for $300." He argued that the state had available to it unlimited amounts of money, but that the defendant had been limited to $300 for this particular expert. He contended that this was a denial of equal protection. The trial court inquired whether counsel had made application to the state board for further funds, and was advised that no such application had been made. The court then denied the motion.

The equal protection and due process clauses "emphasize the central aim of our entire judicial system—all people charged with crime must, so far as the law is concerned, 'stand on an equality

before the bar of justice in every American court.'" *Griffin v. Illinois,* 351 U. S. 12, 17, 100 L. ed. 891, 76 S. Ct. 585. We have found no cases, and counsel cite none, which require the state to furnish the defendant with an equal amount of funds and services as are within the reach of the state. Such would be an impossibility. The thrust of the equal protection clause, in the area in which we are here interested, is to require that all persons be treated alike under like circumstances and conditions. 16 Am Jur 2d, Constitutional Law, § 488. To this end, K. S. A. 22-4508 and the regulations have been enacted, in order to make the services of experts available to those who need them and are unable to obtain such services because of indigency. The appointment of experts is not a constitutional requirement; rather, requests for such services are to be measured by the requirements of the due process test of "fundamental fairness." *State v. Campbell,* 210 Kan. 265, 500 P. 2d 21, citing *Watson v. Patterson,* 358 F. 2d 297 (10th Cir. 1966).

We should point out the familiar rule that an appellant has the burden of furnishing a record which affirmatively shows that prejudicial error occurred in the trial court. *State v. Pettay,* 216 Kan. 555, 532 P. 2d 1289, and cases cited therein. The record before us does not disclose the handwritten document or its contents; nor does the record disclose whether the document was offered or received in evidence, or whether any handwriting experts testified on behalf of the state—although we were advised in oral argument that two experts so testified.

Assuming that the document was received in evidence and that handwriting experts were called by the state to link it to the defendant, we are still in the dark. The contents of the document, its import, and the count or counts to which it relates remain matters of speculation.

The trial court authorized $300 for the employment of an expert. Defense counsel was unable to engage one within that budget; yet never at any time were additional funds requested. The trial court was not advised of the probable expense involved. No application was made directly to the state board. The defendant failed to exhaust the avenues open to him to secure the services of an expert, and in effect abandoned his attempts to secure them.

Further, it appears that the matter of handwriting was but a small portion of the state's case; it was not an essential part of

the state's proof, as would be the case in a prosecution for forgery. Here it was but cumulative evidence.

In federal reviews involving section 3006A (e), it has been said that reversal is indicated only where a defendant *has established prejudice by clear and convincing evidence. Mason v. State of Arizona*, 504 F. 2d 1345 (9th Cir. 1974). We have no such showing here, and conclude that the trial court did not abuse its discretion, and that it properly overruled the motion to dismiss.

Finally, we turn to the defendant's claim that the court erred in refusing him an "independent" mental examination. He originally moved for a mental evaluation at the Menninger Clinic at an anticipated cost of $1000. No facts supporting that motion were furnished to the trial court, and the motion was denied. On a subsequent motion, however, the trial court directed that the defendant be taken to the North Central Kansas Guidance Center at Manhattan, Kansas, for mental examination; this was done. The psychiatrist submitted a written report in which he expressed the opinion that the defendant was competent to stand trial, that he understood the nature of the charges against him and was capable of cooperating in the preparation of his defense, and that he was not insane in the legal sense of the word while committing the alleged offenses. Thereafter, the trial court denied subsequent motions for further mental examination.

Nowhere in this record is there any indication that the trial court was furnished with any factual information tending to support such requests. Defendant had been in the army for six years and was on active duty at Fort-Riley when arrested. There was no showing of any history of mental illness, disease, defect, or mental retardation; no indication of whether the defendant had ever required psychiatric care or treatment; nothing to indicate that defendant acted in any manner other than normal, when appearing before the trial court; and no indication that defense counsel had any difficulty communicating with his client. We find none of this information in the record and no indication that such or similar information was presented in support of the motions.

The trial courts, in the exercise of their sound discretion, must determine whether psychiatric examinations are required, and whether expertise in the field should be made available to an indigent defendant for purposes of trial. K. S. A. 22-3302, since amended; 22-4508. Such discretion cannot be exercised in a vacuum; a trial court can only act upon the record before it, and

here the defendant made no showing of the need for examination or for the services of expert witnesses. Accordingly, we hold that the trial court did not abuse its discretion in denying the unsupported motions.

The judgment is affirmed.